UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 20-cr-187-01 |
| VERSUS | CHIEF JUDGE HICKS |
| EDWARD MCINTYRE (01) | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

**Introduction**

Edward McIntyre ("Defendant") is charged with one count of possession of a firearm by a convicted felon. The charge arises out of an investigatory stop of a vehicle in which Defendant was a passenger. Before the court is Defendant's Motion to Suppress (Doc. 16), which challenges the validity of the stop. For the reasons that follow, it is recommended that the motion be granted.

**Relevant Facts**

A hearing was held on the motion to suppress. The facts set forth below are based on the testimony given by the police officers involved in the encounter. There are no videos of the events. The several police cars involved were equipped with dash camera recording devices, but the officers failed to properly "tag" the videos to preserve them. Tr. 57.[1]

Corporal Carlos Glass-Bradley was conducting a directed patrol of the Queensborough neighborhood as part of his duties with the Shreveport Police

---

[1] Video recordings, which are activated when the police officers turn on their emergency lights, would have been of little assistance in resolving this motion to suppress. The key fact in this case—the hand-to-hand transaction—occurred before any emergency lights were activated.

Department's Street Level Interdiction Unit ("SLIU"). Queensborough is a high-crime area, and Glass-Bradley has made many arrests in that area for shootings, assaults, narcotics, and the like. Tr. 4-7.[2]

At 10:00 p.m. on June 13, 2019, Glass-Bradley was travelling westbound in an unmarked car on Darien Street in the Queensborough neighborhood when he saw a black male, later identified as Defendant, standing outside the driver's side door of a white Saturn. Glass-Bradley came within about five feet of the man as he drove slowly past the Saturn. Glass-Bradley saw what appeared to him to be a hand-to-hand transaction between Defendant and the female driver of the Saturn. *He did not see what Defendant handed to the female*. Glass-Bradley testified that he has been involved in about 300 hand-to-hand drug deals as an undercover police officer. Based on his experience, he believed he had just witnessed a drug transaction. Tr. 9-11.

Glass-Bradley continued to slowly pass the vehicles as he radioed Agent Bassett, Sgt. Miller, and Agent Owen, the other SLIU members patrolling the area. Glass-Bradley told the officers, "I just observed a hand-to-hand on Darien." Glass-Bradley saw Defendant walk to a Mercedes that was parked on the street in front of the Saturn. Glass-Bradley turned his car around, turned on his emergency lights, and pulled up behind the Saturn. Tr. 11-13, 26.

---

[2] The Shreveport area has experienced a substantial increase in violent crimes over the last several years. Precious few areas of the city would not be considered high-crime areas.

At that same time, the other agents began arriving at the scene. Tr. 26. Sgt. Miller parked his vehicle directly beside the Mercedes.³ Agent Owen, who was a passenger in Sgt. Miller's vehicle, exited the vehicle and approached the back of the Mercedes.⁴ Owen saw Defendant in the front passenger seat leaning down like he was placing something or moving something under his seat. Owen walked to the passenger side window of the Mercedes and shined his flashlight into the vehicle. He shined the flashlight on Defendant's face, and Defendant remained still. Owen then shined the flashlight on Defendant's hands and saw that Defendant was holding several baggies of crack cocaine. Owen then shined the flashlight on the floor of the vehicle, where he saw a handgun.⁵ Tr. 41, 45-46, 47. The witnesses never said who, if anyone, was in the driver's seat, but they did refer to the Mercedes as Mr. McIntyre's car and said two black males (including Defendant) were in it.

Owen opened Defendant's door and asked him to step out of the vehicle. Defendant complied. Owen removed the drugs from Defendant's hands, placed them on top of the

---

³ Neither Agent Owen nor Agent Miller could remember whether they had their emergency lights on when they pulled up to the scene. Agent Miller testified that he believed the lights were on because they were performing a stop. Tr. 63.

⁴ Agent Owen testified that if the driver of the Mercedes had attempted to leave, they would have followed the Mercedes. Agent Owen said that, at the time they approached the Mercedes, the vehicle was not free to leave because he believed the hand-to-hand transaction gave the officers reasonable suspicion to make an investigatory stop. Tr. 55.

⁵ These facts (the furtive movements, Defendant remaining still when the flashlight was shining on him, the bags of cocaine, and the discovery of the handgun) all occurred *after the stop* was initiated. Reasonable suspicion is based on what the officers knew at the time of the stop. United States v. Nelson, 990 F.3d 947, 953 (5th Cir. 2021). Therefore, the Government cannot rely on those facts to justify the stop in the first instance.

vehicle, and placed Defendant in handcuffs. Owen read Defendant his Miranda rights, and Defendant indicated that he understood them. Defendant said that the drugs and gun were his. Tr. 47-50.

Once Corporal Glass-Bradley saw the headlights of the other agents' vehicle pull up to the scene, he kept his focus solely on the Saturn. Tr. 27. He got out of his vehicle and made contact with the female driver. Her window was down, and he could smell a strong odor of marijuana. Dee Williams was the driver and sole occupant of the Saturn. As Glass-Bradley approached Williams, he saw her attempt to shove something into her pants. Glass-Bradley told Williams to show her hands but, instead of complying, she began to reach between the seats. Thinking she may be reaching for a weapon, Glass-Bradley told Williams to get out of the car. She again did not comply, so Glass-Bradley removed Williams from the car. He frisked her and found three bags of marijuana on her person.[6] He placed her in handcuffs and advised her of her Miranda rights. Tr. 17-22.

**Law and Analysis**

Defendant argues in his motion to suppress that the initial stop was not based on reasonable suspicion and, therefore, all evidence and statements that were obtained as a result of the stop should be suppressed. The Government responds that Corporal Glass-Bradley had reasonable suspicion because he witnessed a hand-to-hand transaction in a

---

[6] Again, these post-stop facts are irrelevant to whether the initial stop was justified. See footnote 5.

high-crime area and, under the collective knowledge doctrine, Agents Owen and Miller had reasonable suspicion to perform an investigatory stop.[7]

While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the "very narrow exception" announced in Terry v. Ohio, 88 S.Ct. 1868 (1968), police officers may briefly detain a person for investigative purposes if they can point to "specific and articulable facts" that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime. United States v. Hill, 752 F.3d 1029, 1033 (5th Cir. 2014). Although "reasonable suspicion" is more than a "mere hunch," it "need not rise to the level of probable cause." United States v. Zavala, 541 F.3d 562, 574 (5th Cir. 2008), quoting United States v. Lopez–Moreno, 420 F.3d 420, 430 (5th Cir. 2005). An "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion into the privacy of the detained individual. Terry, 88 S.Ct. at 1868.

To find that reasonable suspicion existed to justify a stop, a court must examine the "totality of the circumstances" in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop only if it finds that the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 122 S.Ct. 744 (2002). This is consistent with the "touchstone of Fourth

---

[7] In its initial brief, the Government argued that the encounter was not an investigatory stop that required reasonable suspicion but was a consensual encounter. In its post-hearing brief, the Government conceded this issue based on Agent Owen's testimony that Defendant was not free to leave. Doc. 29, p. 2, fn. 2.

Amendment analysis [being] reasonableness," which "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

The Government argues that Corporal Glass-Bradley had reasonable suspicion to stop Defendant based on two facts: (1) Defendant was in a high-crime area and (2) Defendant engaged in a hand-to-hand exchange. As to the first fact, presence in a high-crime area alone does not justify a Terry stop, but it is relevant when linked with other suspicious facts. Brown v. Texas, 99 S.Ct. 2637 (1979).

As to the second fact, courts often find reasonable suspicion where the officers observed an exchange or transfer of some sort and *the transfer was coupled with other factors*, like a tip from a confidential informant or when the suspect flees upon seeing the police. For example, in State v. Sam, 988 So.2d 765 (5th Cir. 2008), the Fifth Circuit found reasonable suspicion where the defendant tried to evade officers in a high-crime area after engaging in a hand-to-hand transaction with another man who fled at the sight of police. In United States v. Paulette, 457 F.3d 601 (6th Cir. 2006), the court found that officers had reasonable suspicion that the defendant was engaged in criminal activity based upon hand movements consistent with a hand-to-hand transaction, efforts to evade police upon noticing them, and presence in a high-crime area.[8] In State Flagg, 760 So.2d 522, 527 (La.

---

[8] Evidence of flight from an officer is generally admissible at trial in tending to show guilt. United States v. Templeton, 624 F.3d 215 (5th Cir. 2010). There is no evidence that Defendant attempted in any way to avoid or evade the police.

App. 5th Cir. 2000), reasonable suspicion was based on a hand-to-hand transaction in a high-crime area and the defendant's "startled facial expression at the sight of police."

In United States v. Wright, 2012 WL 1636087 (M.D. La. 2012), there were numerous other facts besides the hand-to-hand transaction that led to a finding of reasonable suspicion. Officers were conducting surveillance based on a tip from a confidential informant, who told police that a drug transaction involving cocaine would occur in the driveway of a specific address at approximately 4:00 that afternoon. The source described the car that the defendant would be driving to deliver the drugs. At approximately 3:45 p.m., a vehicle matching the informant's description pulled into the driveway. The defendant exited his vehicle and walked to the driver's side window of another vehicle and conducted what one officer described as a "hand-to-hand transaction," although the officer could not see what was exchanged. Based on the totality of those circumstances, including the officer's ability to corroborate most of what the CI said, the court found reasonable suspicion existed to stop the defendant.

In State v. Fearheiley, 979 So.2d 487 (La. 2008), an officer observed the defendant engage in an apparent hand-to-hand transaction but was unable to determine what was exchanged. The evidence showed that the exchange lasted 15 to 20 seconds "inside one of two cars which had arrived separately in the parking lot of a Circle K store with no apparent purpose that evening other than facilitating the brief exchange before the parties, who appeared to the officer to have no other connection to each other, then went their separate ways." The court found reasonable suspicion existed to stop the defendant based on the officer's experience and the nature of the exchange.

In this case, however, the factors relied on by the Government are not enough, when viewed in totality, to support a finding of reasonable suspicion. The only factors present in this case are (1) the high-crime nature of the neighborhood and (2) what "appeared to be a hand-to-hand transaction" about which no details were provided. At the suppression hearing, Glass-Bradley gave a bare-bones description of the encounter:

> Q: Now, around 10:00 p.m. on June 13, 2019, did you make any observations while operating in the area of Darien Street?
>
> A: Yes.
>
> Q: What did you see?
>
> A: I was traveling westbound on Darien, and I observed a black male standing outside the driver's side door of a white Saturn.
>
> Q: How could you tell it was a man standing in the street?
>
> A: I was - -
>
> Q: How far away? - -
>
> A: About - -
>
> Q: - - from him - -
>
> A: - - five feet.
>
> Q: All right. And what did you see when you approached that man and the vehicle, that white Saturn?
>
> A: There was a - - *what appeared to be* a hand-to-hand transaction between him and the female occupant.

Tr. 9 (emphasis added). Corporal Glass-Bradley admitted that, although he was five feet away when the alleged hand-to-hand exchange occurred, he could not see what was handed off. Tr. 25. He did not provide any details about the hand-to-hand transaction, such as the

length of the encounter or whether cash or any other objects were involved in the exchange. Providing such details may have helped the court find an objective basis for suspecting that the hand-to-hand transaction involved drugs, but such details are lacking.

Glass-Bradley did testify that he has observed numerous undercover drug transactions, and they were completed in a hand-to-hand fashion like the exchange he witnessed. But innocuous items can also be exchanged in a hand-to-hand fashion. Glass-Bradley agreed that the item exchanged could have been an item such as a car key or a cigarette. There were no other articulated factors surrounding the hand-to-hand exchange that made it suspicious of drug dealing.

Unlike Fearheily, where the officers saw the two cars arrive separately at a convenience store, conduct the hand-to-hand transaction and then go their separate ways, this hand-to-hand transaction took place in a residential neighborhood, and there was no evidence about the arrivals of the two vehicles on the street. For all the officers knew at the time, the participants in the transaction were neighbors who were parked in front of their residences. And there was no evidence about how long the parties to the transaction were together before Glass-Bradley saw what appeared to be a "hand-to-hand." There was no tip from an informant, no flight or other evasive conduct by Defendant, no known criminal history of Defendant, or any other factor that would take the hand-to-hand exchange out of the realm of innocent activity. See United States v. Ramirez, 479 F.3d 1229, 1244 (10th Cir. 2007) ("It is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation").

The Government cites several cases in support of its argument that the hand-to-hand transaction in this case gave rise to reasonable suspicion. However, in every one of these cases, there is some fact or circumstance, other than a defendant's seemingly innocent actions, that supported reasonable suspicion that illegal activity was taking place. For example, in United States v. Bass, 996 F.3d 729 (5th Cir. 2021), police were investigating a tip from an off-duty officer that a man matching the defendant's description was standing next to a vehicle and appeared to be selling items from the trunk. Based on that tip and a prior complaint about defendant illegally selling CDs in front of local businesses, an officer was dispatched to respond to the suspicious activity. The defendant was standing near his open car trunk when an officer approached him and asked if there was anything illegal in the vehicle. The defendant responded, "Just the CDs." The defendant explained to the officer that he had been arrested for illegally selling CDs before and asked the officer about the complaint made against him. The officer then detained the defendant to search the vehicle.

In United States v. Thomas, 2021 WL 1957412 (5th Cir. 2021), officers were informed that a vehicle stolen in an aggravated robbery had been identified by an automatic license plate reader in an apartment complex in a high-crime area. The officers drove through the apartment complex and saw the stolen vehicle backed into a covered parking spot. One of the officers confirmed that the license plate matched that of the stolen vehicle. The officers saw two people sitting inside the vehicle and four people, including the defendant, surrounding the vehicle. The officers saw the people outside of the vehicle touching the stolen car or talking to the people in the stolen car, and it appeared to the

officers that all six people knew each other and were having a conversation as a group. The officers stopped and frisked the individuals.

The Government argues that the defendants in these cases were engaged in "very minimal levels of suspicious behavior" when they were observed by officers. However, the officers' reasonable suspicion in those cases was based on factors other than the defendants' otherwise-innocent behavior. In Bass, the reasonable suspicion was based on (1) the tip from an off-duty officer, who saw defendant selling items from his trunk, (2) the defendant's prior history of illegally selling CDs, and (3) the defendant's own admission that he was selling CDs in an area known to law enforcement as a high-crime area. Bass, 996 F.3d at 737-38. In Thomas, the officers had reason to believe defendant was involved in criminal activity because of his "close physical proximity and association with others inside and around" a stolen car.

In United States v. Harris, 188 Fed. Appx. 498 (7th Cir. 2006), the defendant, dressed in a long black coat, was standing outside of a liquor store in a high-crime area. A deputy, who had experience with drug buys and arrests, saw the defendant hand something to another person. The deputy decided to talk to the two men, but the defendant had already started walking away. The deputy ordered him to stop, but he did not. The deputy drew his gun, caught up to the defendant, and handcuffed him. The deputy searched the defendant and discovered a gun and crack cocaine in his possession. The deputy testified that he was suspicious that a drug deal had occurred, but he could not articulate what was passed between the two individuals. The Seventh Circuit first considered the defendant's

presence in the high-crime area and the hand-to-hand exchange, indicating that *those two factors alone would not amount to reasonable suspicion*. The court noted:

> Other courts have recognized that an observed exchange or transaction can support a reasonable suspicion of drug dealing at least when the police can articulate what they saw exchanged and possess additional facts beyond the purported transaction supporting the suspicion … Here, though, Deputy Woods's conclusion that the exchange involved drugs is based on no particularized facts and is more akin to the very type of "hunch" that the Fourth Amendment protects against.

Harris, 188 Fed. Appx. at 501 (internal citations omitted). However, the court also considered the defendant's refusal to stop when commanded to do so and held that this behavior contributed to reasonable suspicion. Harris, 188 Fed. Appx. at 501-02. As in Harris, Corporal Glass-Bradley did not see what, if anything, was exchanged, but neither Defendant nor the other party to the transaction attempted to flee or walk away when the officers approached.

The Government emphasizes Glass-Bradley's experience working as an undercover narcotics officer and performing hundreds of undercover hand-to-hand drug transactions for four years. The officer's training is important because the facts are to be viewed through the eyes of an objective officer with Glass-Bradley's experience. United States v. Freeman, 914 F.3d 337 (5th Cir. 2019). But the Government "fails to suggest what an experienced officer might know that would take this exchange out of the realm of innocent behavior." Harris, 188 Fed. Appx. at 501, citing Johnson v. Campbell, 332 F.3d 199, 208 (3d Cir. 2003) (noting that there are limits "to how far police training and experience can go towards finding latent criminality in innocent acts").

In <u>Ray v. State</u>, 40 So.3d 95 (Fla. Dist. Ct. App. 2010) the officer could not identify the objects exchanged in the hand-to-hand transaction and did not identify the individual involved in the exchange with the defendant as a known drug dealer. The record in that case did not indicate that the neighborhood had a history of extensive drug arrests; rather, it had only a general reputation as a high drug area. The court stated: "In cases where the transaction occurred within a high drug area, courts have refused to acknowledge a reasonable suspicion in the absence of other factors." <u>Id</u>. at 98. Finding no reasonable suspicion, the court further stated, "[A]n officer's observation of hand-to-hand movements between persons in an area known for narcotics transactions, without more, does not provide a founded suspicion of criminal activity." <u>Id</u>.

The most recent case that has been found by the undersigned on this issue is the Fourth Circuit's decision in <u>United States v. Drakeford</u>, 992 F.3d 255 (4th Cir. 2021). In that case, a confidential informant contacted the police and stated that a light-skinned black male, who was heavy-set and had a full beard, was trafficking cocaine and heroin. The CI provided the suspect's vehicle tags but did not provide a name or address. The informant also did not provide the officers with any predictive behavior of the suspect, such as that he was going to sell drugs to her on a particular date. Through further investigation, the police linked a suspect to the vehicle tags and discovered the suspect's identity. The police learned that the suspect had been arrested several times for drugs, but the police did not have any knowledge of any convictions resulting from such arrests.

Several months later, the police began surveillance at the suspect's address. The officers never saw the suspect at that location. However, the officers identified a female

associate of the suspect, and they observed the suspect at that residence over 30 times but never witnessed any drug transactions.

About six months after the initial tip from the CI, the officers saw the suspect leave the female associate's residence and drive to a gas station. The suspect remained in his vehicle until a white pickup truck pulled up and parked next to him. The occupant in the pickup truck exited his vehicle, entered the suspect's car, remained in the suspect's car for 30 to 45 seconds, then exited the suspect's car, reentered his own vehicle, and drove away.

The officers followed the white pickup truck. The officers believed the driver got high on drugs after he left the gas station because he had difficulty maintaining his speed. The officers called in other officers to make a traffic stop. During the traffic stop, a canine detected drugs, but the officers found only syringes in the vehicle.

A few days later, the officers saw the suspect leave the female associate's residence and travel to a different gas station. The suspect parked and sat in his car. Nothing else happened. The suspect returned to the female's residence. That same day, the officers contacted the CI and asked her to contact the suspect and ask him if he had any heroin to sell. She did so. The CI told the officers that the suspect did not have any heroin, but he was waiting for a supply. Later that day, the officers saw the suspect leave the female associate's residence and enter another residence. A car with Florida license plates arrived at the home, and a person entered the home carrying several bags. About an hour later, the suspect left the home carrying a bag. Detectives followed the suspect back to the female's residence, and while they were following him, the suspect called the CI to notify her that he had drugs to sell.

About a week later, the officers saw the suspect leave the female associate's residence and drive to the parking lot of a local business. That area was not a high crime area, and it was directly in front of a security camera. While the suspect was waiting in his car, a white car pulled up and two males exited the vehicle. The suspect also exited his vehicle. One officer testified that this interaction was consistent with how the suspect meets people in public areas. He further testified, "I honestly believe that it was a drug deal that was going to happen, a transaction was going to occur." Drakeford, supra, at 260.

Another officer radioed that a hand-to-hand money and drug exchange occurred in the parking lot between the suspect and one of the men. One officer testified that he witnessed "a quick handshake … some brief conversation." Id. Then, as the men continued talking, they exchanged a second handshake, which the officer believed to be a hand-to-hand narcotics transaction. The officer admitted that he did not see drugs or money exchanged, but it was the actions and mannerisms that indicated to him that it was a drug transaction.

After the two handshakes, the suspect and the two men entered the business. The officers thought that suspicious activity may be occurring inside the business, so an officer entered the store behind the three men. The men were talking to a salesperson about purchasing something, and they remained in the store for about 10 or 15 minutes. While standing at a counter, one of the men had a backpack, which was at his feet. When the officer walked past the men, the man with the backpack slid it closer to him with his foot as if he was protecting it. Id.

The officers confronted the suspect in the parking lot when he exited the store and entered his vehicle. They asked him to step outside from the driver's side of his vehicle. One officer testified that the suspect's body language was consistent with not being completely truthful or the suspect appeared to be somewhat apprehensive. Id. at 261. The suspect was not very compliant, so the officers handcuffed him. One officer testified that he patted down the suspect's pocket and felt what was immediately apparent to him as narcotics. The officer pulled a round bag of contraband out of the suspect's left pocket. After the search at the local business, the officers executed a search warrant at the female associate's residence and found additional drugs and a firearm.

The suspect filed a motion to suppress the evidence, claiming that the stop was unlawful and that the evidence found from the search warrant were the fruits of an unlawful search. The court denied the suspect's motion to suppress. The district court found that, based on the information provided by the CI and the observations of the suspect during the surveillance operations, together with the officer's observation of the hand-to-hand transaction, the officers reasonably believed that criminal activity was afoot. The district court also noted the suspect's nervous behavior and body language, the suspect placing his hands in his pockets, and the officer's knowledge of the suspect's criminal history and known affiliation with the distribution of narcotics.

The Fourth Circuit reversed. The court began with the information provided by the CI. The court found the officers' testimony on the reliability of the CI was scant. The CI offered only two pieces of information about a person who was allegedly trafficking cocaine and heroin: first, that the person was a "light skinned black man, heavy set" "with

a full beard"; and second, the vehicle tags for the person's car. The only information the CI provided that was useful to the officers was the suspect's vehicle's tag number. But that alone, said the court, "does not connect him to drug trafficking. It connects him to a vehicle and that is it."

The Fourth Circuit then focused on the "notorious second handshake." The Government argued that it was this handshake that provided the officers with reasonable suspicion because an officer testified that the second handshake was a hand-to-hand transaction. However, the officer "never provided more than this conclusory testimony." In fact, said the court, the officer "never witnessed drugs or money change hands, and his testimony did not provide any details about the handshake that allows us to view this second handshake as suspicious." Id. at 264. According to the court,

> "[W]e cannot hold that the officers' bare suspicion of drug trafficking—without more—can allow even an experienced officer to reasonably conclude that such a benign and common gesture can be viewed as an exchange of drugs. This cannot amount to reasonable, particularized suspicion."

One member of the Fourth Circuit's panel, Judge Wynn, issued a concurring opinion. He noted that the district judge credited the officer's testimony that the handshake was, in fact, a hand-to-hand transaction. The district judge did so because the officer had been a narcotics officer for about four years, and in that capacity, he had seen several dozen hand-to-hand transactions and, acting undercover, had conducted a few himself. According to the officer's testimony, the suspect's interaction was "consistent with" the hand-to-hand transactions he had seen and done. Id. at 266.

Judge Wynn noted that, in the half century since <u>Terry v. Ohio</u>, courts have afforded greater and greater weight to officers' "training and experience," often at the expense of the robust judicial scrutiny that the Fourth Amendment demands. Judge Wynn explained that experienced officers can see things the rest of us would miss, but the success or failure of a suppression motion cannot hinge on an officer saying, in essence, "I know it when I see it." The Fourth Circuit's decision in <u>Drakeford</u>, as well as the concurring opinion, are well reasoned and persuasive that reasonable suspicion for a <u>Terry</u> stop was also lacking in this case.

**Conclusion**

Judge Rubin once wrote that "it is our duty under Article III of the Constitution to uphold the guarantees of the Bill of Rights that assure the public protection from the unconstitutional acts of the other branches. The Constitution protects all individuals, *even the unworthy*, from governmental invasion of their protected rights … . The public is not punished but served when the constitutional rights of the nation's citizens are safeguarded. When other branches of government fail in their duty, it is our responsibility in the cases that come before us to call the foul." <u>United States v. Causey</u>, 834 F.2d 1179, 1190 (5th Cir. 1987)(Rubin, dissenting)(emphasis added). This duty requires suppression of the evidence at issue, even though Defendant was caught red-handed with drugs and a gun.

There are numerous examples that come to mind where a contrary result would allow police to interfere with the daily affairs of law-abiding citizens. For example, if the police see Person A stop at any virtually any intersection in Shreveport, Baton Rouge, or New Orleans (high crime areas abound in each city) and engage in conversation with

Person B, who is standing on the corner, see Person A engage in a hand-to-hand transaction with Person B, then see Person A drive off, Person A would be subject to a <u>Terry</u> stop, even though the officer did not see what was exchanged and knew nothing about Person A or Person B. Perhaps the police witnessed a drug transaction. But it is equally likely that it was innocent behavior such as Person A giving a donation to Person B, who explained that he was homeless and hungry, and Person B offered Person A a handshake of thanks before Person A drove off. For a <u>Terry</u> stop to be supported by reasonable suspicion, the officer must be able to articulate additional facts what would suggest the person was committing a crime.

Here, the totality of the circumstances shows that the Government has not met its burden of showing that the officer possessed the requisite objective, particularized reasonable suspicion to justify stopping Defendant. The officer's testimony that he saw what appeared to be a hand-to-hand transaction is too bare and conclusory to support reasonable suspicion, even though the transaction happened in a "high-crime area." Some other factors must be shown to establish reasonable suspicion.

The gun and drugs seized in the stop should be suppressed. Likewise, Defendant's statement that the drugs and gun were his should be suppressed because there was no intervening event that broke the causal connection between the illegal seizure and Defendant's statement. <u>See</u> <u>United States v. Hernandez</u>, 670 F.3d 616, 620-21 (5th Cir. 2012).

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 16) be granted, and the drugs, gun, and Defendant's statements be suppressed from use at trial.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of July 2021.



Mark L. Hornsby
U.S. Magistrate Judge